UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
---------------------------------------------------
In re

     CNB INTERNATIONAL, INC.,                         99-11240 B

                     Debtor                DECISION & ORDER
---------------------------------------------------
CNB INTERNATIONAL, INC. and THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS OF CNB INTERNATIONAL, INC.,

                     Plaintiffs

        v.                              AP 01-1193 B

TIMOTHY S. KELLEHER, JULIE KELLEHER, KELLEHER &
COMPANY, INC., KELLEHER & COMPANY LLC, SCHWARTZ
& FREEMAN, NORTHLANDS INC. f/k/a CLEARING-NIAGARA,
INC., ENPROTECH CORP., ENPROTECH MECHANICAL SERVICES,
INC., EMS PARTS INC., EMS SPARES INC., VERSON INTER-
NATIONAL GROUP, plc, VERSON INTERNATIONAL GROUP, INC.,
LITTELL INTERNATIONAL, INC., CIT LENDING SERVICES
CORPORATION f/k/a NEWCOURT COMMERCIAL FINANCE COR-
PORATION f/k/a AT&T COMMERCIAL FINANCE CORPORATION,
LLOYDS TSB BANK PLC f/k/a LLOYDS BANK plc, and JOHN
DOE #1 THROUGH JOHN DOE #20,

                     Defendants
---------------------------------------------------

                     Kenneth Oestreicher, Esq.
                     Gary S. Posner, Esq.
                     Cameron J. Macdonald, Esq.
                     WHITEFORD, TAYLOR & PRESTON L.L.P.
                     Seven Saint Paul Street
                     Baltimore, Maryland 21202-1626
                           and
                     Robert J. Feldman, Esq.
                     GROSS SHUMAN BRIZDLE & GILFILLAN PC
                     465 Main Street, Suite 600
                     Buffalo, New York 14203-1787
                     Attorneys for the CNB International Litigation Trust

                     Robert I. Bodian, Esq.
                     David L. Barres, Esq.
                     Francis J. Earley, Esq.
                     Paul J. Ricotta, Esq.
                     MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C.
                     666 Third Avenue
                     New York, New York 10017
                     Attorneys for Defendant Lloyds TSB Bank plc

Bucki, Chief U.S.B.J., W.D.N.Y.

In this adversary proceeding, the plaintiffs seek to recover a fraudulent conveyance that allegedly occurred when the debtor corporation was formed through a leveraged buyout. During an intense trial of almost three weeks duration and in post-trial briefs totaling more than 400 pages in length, the parties have presented a plethora of complex legal and factual issues concerning valuation and liability. Although the court has carefully considered every argument of counsel, this written opinion will specifically discuss only those issues whose resolution will most significantly affect the decision herein.

The present controversy arises from the concluding chapter in the history of an important segment of manufacturing in Buffalo, New York. Starting in 1879, the Niagara Machine and Tool Works conducted business as a manufacturer of metal presses and tools. Over time, this company became a leader in the metal press industry. During the 1990's, however, the business became the object of two restructurings that Timothy S. Kelleher would orchestrate on behalf of a British holding company called Verson International Group plc.

Verson International Group plc ("Verson plc") is the parent of Verson International Group, Inc., a corporation established for the purpose of holding various North American acquisitions. In 1992, this subsidiary acquired Niagara Machine and Tool Works, as well as Hitachi-Zosen Clearing, Inc., a metal press manufacturer with plants in Chicago and Detroit. These two companies then merged to form Clearing-Niagara, Inc. ("Clearing-Niagara"), which consolidated operations into its Buffalo facilities. Although Clearing-Niagara would show some initial profitability, the financial needs of its parent created the motivation for further restructuring.

Since 1985, Verson plc maintained a credit relationship with Lloyds TSB Bank plc ("Lloyds Bank"), the primary defendant herein. By the summer of 1994, however, both parties realized that outstanding loans from Lloyds Bank had become significantly undersecured. To remedy

this problem, Verson plc proposed to sell its North American assets through an initial public offering. Meanwhile, if it were to have any hope to implement such an offering, Verson plc would need bridge financing in the approximate amount of $10 million. Accordingly, Lloyds Bank agreed to lend this additional amount, but on condition that Verson plc recapitalize all of its outstanding credit facilities. As part of this transaction, Verson plc caused Clearing-Niagara to pledge all of its assets to Lloyds Bank. This lien held priority second only to the security interest of Marine Midland Bank. Although it provided security for the bridge financing, Clearing-Niagara received none of the proceeds from the new loan.

Due to an inability to satisfy regulatory requirements, Verson plc never finalized the initial public offering of its ownership interests in Clearing-Niagara. Instead, Verson plc resolved to pursue what the parties have labeled as the "formation transaction." At the time, Timothy Kelleher served as Chairman and Chief Executive Officer of Verson plc. Essentially, Mr. Kelleher proposed to form a new corporation for the purpose of acquiring the assets of three entities, namely Clearing-Niagara; E.W. Bliss Company; and Press Parts Plus, L.P ("Press Parts Plus"). This new corporation became CNB International, Inc., the debtor herein.

Through the formation transaction, Timothy Kelleher sought to amalgamate three players in the metal press industry. Clearing-Niagara was primarily engaged in the manufacture of large presses with capacities between 400 and 1,500 tons. Operating in Michigan since 1857, the E.W. Bliss Company specialized in the manufacture of 30 to 400-ton presses. Press Parts Plus, L.P. was a joint venture owned equally by Clearing-Niagara and Enprotech Mechanical Services, Inc. ("Enprotech"). The assets of the joint venture consisted of exclusive licenses to use various design archives. Access to such archives would provide competitive advantages with regard to the aftermarket segment of the metal press business. The aftermarket business essentially involved the retrofitting and repair of existing machines, to enable them to serve the current needs of the owner.

The purported rationale for Kelleher's business plan had three components.  First, he aimed to achieve synergies through the consolidation of new press production into a factory in Buffalo, and the consolidation of aftermarket production into a facility in Michigan.  Second, his plan would gather into one company the archives of drawings for the majority of metal presses ever produced in the United States.  Third, Kelleher expected to use the archives to generate high-margin aftermarket sales.

Sometime prior to October of 1996, Timothy Kelleher and his wife Julie joined with a related entity called Kelleher and Company, Inc., to form Kelleher & Company LLC, a limited liability company under Delaware law.  Verson plc purchased a preferred membership interest in Kelleher & Company LLC for $10 million, and then sold that interest to Lloyds Bank for the like sum of $10 million.  Indirectly, therefore, Lloyds Bank served as the source of funding for Kelleher & Company LLC.  Kelleher & Company LLC then used these monies to finance part of the formation transaction.

CNB International, Inc. ( "CNB" or "the debtor" ) was ostensibly capitalized through the sale of stock to investors for the sum of $5 million.  Specifically, Kelleher and Co. LLC, paid $4,250,000 to purchase an 85 percent interest of the corporation's common stock, while other senior managers of the new corporation invested $750,000 to acquire the remaining common stock.  In addition, CNB issued preferred stock to Great Banc Trust Co., for a consideration of $3,187,000.  Notably, however, the majority of any equity investment derived from borrowed funds.

As is to be expected in any leveraged buyout, CNB obtained most of its funding through debt financing.  Sources included a term loan in the amount of $38 million from AT&T Commercial Finance Corporation; a revolving credit facility in the amount of $25 million from Marine Midland Bank, N.A.; and a further loan of $7,313,500 from Kelleher and Co. LLC.   As security for its revolving credit facility, Marine Midland Bank received a first lien with respect to

all inventories, accounts, and related contracts of the newly formed entity. Meanwhile, AT&T Commercial Finance Corporation obtained a first-priority lien on all other tangible and intangible assets of CNB, and a second position with respect to the assets that CNB had already pledged to Marine Midland Bank.

The formation transaction closed on October 18, 1996, when CNB completed the acquisition of its three components. From the monies that were invested or loaned, CNB purchased the assets of E.W. Bliss Company for an adjusted cash consideration of $15,395,315, together with the assumption of various liabilities. Secondly, CNB paid the adjusted consideration of $5,984,000 for Enprotech's half interest in the assets of Press Parts Plus, again with the assumption of liabilities. The complaint in the present adversary proceeding includes claims arising from the Press Parts Plus acquisition, but those causes of action have been settled by stipulation. Rather, the outstanding dispute involves the third component of the formation transaction, namely, the acquisition of Clearing-Niagara by CNB.

As consideration for the assets of Clearing-Niagara, CNB assumed various liabilities and paid to Clearing-Niagara the sum of $43,805,838. Immediately after its receipt of these funds, Clearing-Niagara disbursed the entire amount to satisfy various obligations. In particular, it transferred two large sums to Lloyds Bank. First, it deposited $1,600,000 into a cash collateral account to secure a standby letter of credit to be used, if necessary, to pay obligations related to an employee stock ownership plan. Second, Clearing-Niagara paid to Lloyds Bank the sum of $24,385,569, which Lloyds Bank then applied against the overdraft credit facility of Verson plc. Essentially, this later payment reduced Verson's debt to Lloyds Bank by the full amount of the transfer.

After the closing of the formation transaction, CNB operated its metal press manufacturing and re-manufacturing business from facilities in Buffalo, New York, and Hastings, Michigan. Unfortunately, the company failed to achieve projected levels of sales and quickly

encountered financial problems.  As a consequence, on March 10, 1999, CNB filed a petition for relief under Chapter 11 of the Bankruptcy Code.  Shortly thereafter, the Office of the United States Trustee appointed an official committee of unsecured creditors.  While operating as a debtor in possession, CNB joined with this committee to commence the present adversary proceeding on March 8, 2001.

On April 26, 2001, this court issued its order confirming a plan of reorganization. Pursuant to that plan, the debtor closed its Buffalo facility, but transferred its design archives and the physical assets in Hastings to a new corporation, which continued the aftermarket business.  The plan also required the formation of the Litigation Trust, which would prosecute the current and various other adversary proceedings for the benefit of creditors.

The plaintiffs initiated the present adversary proceeding against multiple defendants to recover fraudulent conveyances that allegedly occurred as part of the formation transaction. With the approval of the Litigation Trust and this court, the plaintiffs have resolved all of their claims except those that they have asserted against Lloyds Bank.  With respect to Lloyds Bank, the plaintiffs contend that CNB received less than fair consideration when it purchased the assets of Clearing-Niagara; that a fraudulent conveyance occurred with CNB's transfer of $43,805,838 to Clearing-Niagara; and that Lloyds Bank is liable for the funds that it received because it is to be treated either as an initial transferee or as an immediate transferee from the initial recipient of the fraudulent conveyance.  In response, Lloyds Bank disputes the fraudulent character of the initial transfer to Clearing-Niagara.  Further, Lloyds Bank asserts the defense that it received payment in good faith and without knowledge of the voidability of the transfer.

### Discussion

Section 544(b)(1) of the Bankruptcy Code provides generally that a bankruptcy trustee may avoid any transfer that an unsecured creditor may avoid under state law.  Pursuant to 11 U.S.C. §1107, a debtor in possession enjoys the rights and powers of a trustee.  As a debtor in

possession, therefore, CNB had standing to pursue claims under state law for the avoidance of

fraudulent conveyances.   Based on this authority, it joined with The Official Committee of

Unsecured Creditors in commencing the present adversary proceeding to avoid transfers made

in violation of the New York Debtor and Creditor Law.[1]

        Debtor and Creditor Law §§ 278 and 279 establish the basic principle that a court may

avoid any conveyance that is fraudulent as to a creditor.   Plaintiffs contend that the payment

of $43,805,838 to Clearing-Niagara was fraudulent under Debtor and Creditor Law §§ 273 and

274.  With respect to conveyances by insolvent parties, section 273 sets the following standard:

> Every conveyance made and every obligation incurred by a person
> who is or will be thereby rendered insolvent is fraudulent as to
> creditors without regard to his actual intent if the conveyance is
> made or the obligation is incurred without a fair consideration.

Alternatively, section 274 recognizes the fraudulent character of conveyances by entities in

business, as follows:

> Every conveyance made without fair consideration when the
> person making it is engaged or about to engage in a business or
> transaction for which the property remaining in his hands after the
> conveyance is an unreasonably small capital, is fraudulent as to
> creditors and as to other persons who become creditors during the
> continuance of such business or transaction without regard to his
> actual intent.

        To the extent that CNB's payment to Clearing-Niagara was fraudulent, the value of the

transfer may be recovered from subsequent transferees who fall within the standards of liability

under 11 U.S.C.  §550.  In relevant part, this section provides as follows:

> (a) Except as otherwise provided in this section, to the extent that
> a transfer is avoided under section 544 . . . of this title, the
> trustee may recover, for the benefit of the estate, the property
> transferred, or, if the court so orders, the value of such property,
> from – (1) the initial transferee of such transfer or the entity for

---

[1]Plaintiffs could have asserted a similar claim under 11 U.S.C. §548, but for the fact that that section
applies only to transfers made within one year prior to the filing of a bankruptcy petition.  11 U.S.C. §548(a)(1).  In
contrast, the New York Debtor and Creditor Law allows the avoidance of transfers made within six years of the
commencement of bankruptcy.  *See* N.Y.C.P.L.R. §213 (McKinney 2003).

> whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.
> (b) The trustee may not recover under section (a)(2) of this section from – (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or (2) any immediate or mediate good faith transferee of such transferee.

To impose liability on Lloyds Bank, therefore, the plaintiffs must establish either of two sets of circumstances. On the one hand, they would need to demonstrate that Lloyds Bank should somehow be viewed as an initial transferee from CNB, and that its receipt of payment was fraudulent under either section 273 or 274 of the Debtor and Creditor Law. Alternatively, the plaintiffs would need to prove that Lloyds Bank was a subsequent transferee of some portion of CNB's payment of $43,805,838 to Clearing-Niagara, that the payment to Clearing-Niagara was fraudulent under the Debtor and Creditor Law, and that Lloyds Bank cannot disclaim liability under 11 U.S.C. §550(b).

The parties have stipulated that CNB paid $43,805,838 to Clearing-Niagara and that CNB further assumed various liabilities, all in consideration for the purchase of substantially all of the assets of Clearing-Niagara. Further, the parties agree that from the account into which the sum of $43,805,838 had been deposited, Clearing-Niagara transferred $25,985,569 to Lloyds Bank. Aside from any question concerning the calculation of damages, the applicable statutes indicate that the imposition of liability upon Lloyds Bank will require the resolution of the following five issues:

1. Did CNB receive fair consideration for its payment of $43,805,838 to Clearing-Niagara?

2. Was CNB insolvent either at the time that it paid $43,805,838 to Clearing-Niagara or as a consequence of that payment?

3. After its payment of $43,805,838 to Clearing-Niagara, was CNB left with an unreasonably small working capital for the business in which it was about to engage?

4.  Can Lloyds Bank be treated as an initial transferee of funds from CNB?

5.  Did Lloyds Bank take for value, in good faith, and without knowledge of the voidability of the transfer?

### Issue 1: Did CNB receive fair consideration for its transfer to Clearing-Niagara?

To establish a fraudulent conveyance under either section 273 or 274 of the New York Debtor and Creditor Law, the plaintiffs must show a transfer for less than fair consideration. Prototypically, this proof involves a simple comparison between the amount of consideration paid and the value of goods acquired.  The present facts are considerably more complicated, however.  Lloyds Bank argues that the formation transaction achieved synergies that gave to CNB a value that exceeded the sum of the considerations paid on the three component transactions.  Thus, the defendant would rely upon the fairness of consideration for the combined transaction, without regard to whether each segment was separately justified. Curiously, the plaintiffs seem to concede the argument, in that like the defendant, the plaintiffs rely on an appraisal that considers only the fairness of the consideration that the debtor received collectively from the three components of the formation transaction.

From the perspective of the bankruptcy estate, the essential concern is whether CNB paid out more than the value of what it received.  Inasmuch as the transaction entailed a consolidation of three separate acquisitions, however, we must properly consider the value of the consolidated business.  To the extent that the consolidation enabled the debtor to derive some synergistic benefits, those benefits will justify a greater consideration for one or more of the separate components.  In other words, a particular component might enjoy an enhanced value if it were needed to achieve the greater value of a consolidated enterprise.  In evaluating the fairness of consideration for a consolidated entity, therefore, we begin by comparing the total consideration with the business's amalgamated value.  Then, to the extent that the debtor

did not receive a fair consideration for the formation transaction as a whole, we must make an attribution of inadequacy to each of its three components.

As to the fairness of total consideration, each party urges reliance upon the appraisal report of its own expert. With outstanding credentials, both witnesses have been duly qualified as experts and have presented their views in comprehensive written reports as well as extensive testimony. Both witnesses define total consideration as business enterprise value plus the amount of current and other liabilities assumed in the transaction. To determine the fairness of total consideration received, the experts compare its value with the amount of consideration paid.

Michael L. Atkinson of Penta Advisory Services, LLC, served as the plaintiffs' expert. In preparing his valuation, Mr. Atkinson considered two methods of appraisal: an income approach using a discounted cash flow analysis, and a market approach, using a guideline public company methodology. He concluded that at the time of its formation, CNB had a business enterprise value that fell within the range of $45.1 million and $49.7 million. Having assumed liabilities of $38,464,000, the debtor would have received a consideration that totaled between $83,564,000 and $88,164,000. By Mr. Atkinson's calculation, however, CNB paid $109,226,000 for these assets, so that the shortfall of fair consideration would have exceeded $21 million.

For its expert witness, Lloyds Bank selected Richard E. Schmitt from AccuVal Associates, Inc. In his report, Mr. Schmitt gave equal weight to each of three appraisal methods. Like Atkinson, Schmitt applied both a discounted cash flow and a guideline public company analysis, but unlike the plaintiffs' expert, he also employed a mergers and acquisitions approach. Schmitt concluded that at the time of its formation, CNB had a business enterprise value of $76,000,000. After accounting for the assumption of liabilities, he determined that CNB received a total consideration of $114,464,000, for which it paid $113,175,000. Thus, in

Schmitt's view, CNB paid fair consideration for assets having a value approximately greater by $1,289,000 than the cost of acquisition.

Generally, Atkinson and Schmitt follow a similar approach, in that both reports utilized discounted cash flow and guideline public company approaches to valuation. In addition to common issues involving these two approaches, however, the Schmitt appraisal presents two independent concerns, namely with regard to rounding and with regard to reliance on a mergers and acquisitions methodology. Before undertaking a full reconciliation of the positions taken by the two competing appraisers, therefore, the court will adjust for these two areas of concern.

### Preliminary Adjustments and Corrections

In appropriate circumstances, rounding is a useful mathematical tool that allows one to focus more quickly on the ultimate issue of factual dispute. But when outcomes depend on close calculations, rounding may also obfuscate rather than enlighten. For example, the Schmitt report calculated the weighted average cost of capital at 14.67 percent, but applied a rounded number of 14.5 percent to its discounted cash flow methodology. He further applied an upward rounding to the resulting calculation of business enterprise value. Significant consequences followed. By these uses of rounding, Schmitt caused the discounted cash flow method to indicate a business enterprise value that was $550,000 more than what it would otherwise have been. Later, in applying the results of all three valuation methods, Schmitt rounded upward from an indicated value of $75,734,000, to make his finding a business enterprise value of $76,000,000. If Schmitt had not used any of the above cited instances of rounding, however, he would have found a business enterprise value of only $75,550,000. Effectively, therefore, rounding accounts for more than one-third of what Schmitt opined to be the positive value that derived from the formation transaction.

Unlike the plaintiffs' expert, Schmitt applied a mergers and acquisition approach, to which he then assigned a one-third value in his calculation of total consideration. In this

analysis, however, the appraisal gives to the mergers and acquisitions approach an arbitrary weight that the circumstances cannot justify. Altogether, the Accuval appraisal relied on five mergers and acquisitions within the machine tool industry. Schmitt then fails to demonstrate whether these transactions were strategic or investment purchases. In acquiring a business within one's own industry, a purchaser may exhibit a variety of motivations. When the acquisition aims strategically to fill a particular need within an organizational structure, the purchaser may be willing to pay a premium for that asset. But when the acquisition serves as a mere investment, the purchaser will more likely pay only a price that reflects the anticipated return. Not knowing the motivation for any of the five subject sales, we cannot ascertain the accuracy of their indications of value. Consequently, the court must reject Schmitt's use of the mergers and acquisitions approach. This methodology will not merit a one-third weight in anyone's final calculation of value, but will at most serve as a test with limited utility for purposes of comparison with the other valuation methods.

In his conclusion, Schmitt gave equal weight to each of three methods for calculation business enterprise value, as follows:

```
Discounted Cash Flow Method ......................$72,800,000
Guideline Public Company Method ................$73,300,000
Mergers and Acquisitions Method...................$81,100,000
Indicated value based on equal weighting .......$75,734,000
Business Enterprise value (rounded) ..............$76,000,000
```

However, if one were to disregard the mergers and acquisitions method and were to avoid the above referenced instances of rounding, a somewhat different outcome would result, as follows:

```
Discounted Cash Flow Method ......................$72,250,000
Guideline Public Company Method ................$73,300,000
Indicated value based on equal weighting........$72,775,000
```

If the business enterprise value were set at $72,775,000, the debtor would have received a total consideration of only $111,239,000, that is, a sum less than the purchase price, as calculated by Schmitt, of $113,175,000. Thus, even before reconciling all of the differences

between the two expert witnesses, we must conclude that the debtor completed the formation transaction for less than fair consideration.

## Reconciliation of Appraisal Positions

Even after we adjust for rounding and after we disregard the mergers and acquisitions methodology, Schmitt and Atkinson continue to reach markedly different conclusions. As corrected, Schmitt's analysis would indicate a business enterprise value of approximately $72,775,000. Meanwhile, Atkinson suggests a business enterprise value that falls within a range between $45,100,000 and $49,700,000. To reconcile these differences, we must separately examine how these experts respectively applied the discounted cash flow and guideline public company methods of valuation.

Discounted Cash Flow Methodology: Generally speaking, the discounted cash flow method "estimates the present day value of a company's projected future cash flows which would be theoretically available to the capital providers of the company." *Henry v. Champlain Enterprises, Inc.*, 334 F.Supp.2d 252, 258 (N.D.N.Y. 2004). In this approach to valuation, the appraiser will project a debt-free cash flow for a set number of years. For this purpose, debt-free cash flow is defined as operating profit plus depreciation plus amortization, but less capital expenditures, taxes, and change in working capital. The appraiser will then use a weighted average cost of capital to discount the cash flow to derive a present value for each of the projected years. The sum of these values, when added to a terminal value, will establish the business enterprise value.

In its discounted cash flow approach, the Atkinson appraisal finds CNB to have a business enterprise value of between $45.1 million and $49.7 million. With rounding, the Schmitt appraisal sets the same discounted cash flow valuation at $72.8 million. However, each side strenuously contests the accuracy of its opponent's appraisal, particularly with regard to income and expense projections, and with regard to the discount rate.

Counsel for Lloyds Bank argues that an appraiser must estimate value with reliance on information known at the time of the transaction and without reference to knowledge acquired through hindsight.  Thus, it supports the use of management projections in the Schmitt appraisal, and excuses the ultimate failure of those projections as something attributable to unforseen factors like foreign competition and the inability to secure any new contracts with the Ford Motor Company.  In contrast, plaintiffs' counsel asserts that management could have foreseen weaknesses in the machine tool industry, and that Atkinson correctly begins his analysis with lower income projections.  Meanwhile, each side tries to justify significantly different predictions of future expense, particularly with regard to environmental costs and capital investment.

Fundamentally, a discounted cash flow analysis aims to find of value from two main factors, namely projected debt-free cash flow over the course of years and a discount rate.  In determining cash flow, the appraiser must fairly attribute a reasonable estimate to each of a number of relevant considerations, including projections for revenues, costs of production, all manner of other expenses, taxes, depreciation, and amortization.  Further, the appraiser must determine an appropriate discount rate that accounts both for reasonable expectations of investment return and for all forms of risk.  In their arguments, each counsel disputes numerous of the particular projections that their opponent's expert uses to calculate debt-free cash flow.  In truth, all of these estimates enjoy some basis of validity as well as some component of uncertainty.  For this reason, the court need not be drawn into a final resolution of cash flow differences.  Neither of the projections is either completely right or completely wrong.  Rather, we must temper their weight with considerations of risk, as reflected in the ultimate discount rate.  Value will depend not upon either the reasonableness of projections or the accuracy of a discount rate, but upon the interrelationship of these factors.

Theoretically, in a discounted cash flow analysis, the appraiser should balance the reasonableness of his projections with an appropriate consideration of risk. A more aggressive projection of cash flow will normally entail greater risk, and should therefore call for a higher discount rate. Correspondingly, conservative projections represent lesser risk and should therefore justify a lower discount rate. In the present instance, however, the two appraisals belie this expectation of congruity. Despite his more aggressive projections of cash flow, Schmitt applied a discount rate more than four percent lower that the one used by Atkinson. Meanwhile, Atkinson's discount rate reflected risks greater than expected for his more conservative projections.

A careful application of discount rates will best serve to reconcile the discounted cash flow analyses of the two expert witnesses. Both experts set the discount rate as the weighted average cost of capital ("WACC"). Although each appraisal reflects several differences in their calculations, the chief distinction arises from inclusion of an unsystematic risk factor in the determination of the WACC. Indeed, this factor accounts for more than the entire difference in discount rates.

Also referred to as a specific company risk premium, an unsystematic risk factor adjusts for risks associated with a particular business, and with its finances, industry position, and operations. In his report, Schmitt asserts that an unsystematic risk factor is unnecessary, because it would duplicate his use of a small company risk premium. As explained by Schmitt, the small company premium "already reflects the additional risk associated with lack of diversity, financial strength, competition by larger companies, limited depth of management, and other such factors." While Schmitt's position may have merit for certain businesses, the debtor's particular circumstances indicate a business having risks other than those that would be associated with its status as a smaller enterprise. These further risks compel use of an unsystematic risk factor.

From the moment of its formation, CNB encountered at least five risks that evolved from its particular structure and circumstances. First, CNB faced the risk of failure to achieve synergistic benefits from the amalgamation of Clearing-Niagara, E.W. Bliss Company, and Press Parts Plus. In a confidential lending memorandum, the accounting firm of Ernst & Young LLP described the strategy for the formation transaction: "The transaction is being pursued because of the close strategic fit between Clearing-Niagara and Bliss and the significant benefits and synergies management expects to be realized through their combined operation." Essentially, the formation transaction anticipated synergistic benefits and new market penetration. Unfortunately, such expectations lack certainty and are subject to many obvious risks. How quickly would the new business succeed in establishing a cohesive culture for its merged operations? Would the new business overcome disruptions caused by its proposed restructuring? Would former customers transfer loyalty to the new enterprise? Would contemplated synergies even occur, or would the merger merely create a combination of disparate and underachieving factions? These and other similar concerns arise from the reorganization of this particular business and must therefore find separate recognition in the assessment of risk.

Second, special risks arose from the company's reliance on sales to a single customer, namely the Ford Motor Company. In its Post-Trial Reply Brief, counsel for Lloyds Bank blamed the failure to achieve sales projections on "two unforeseeable, devastating, post-closing events: the loss of Ford as a customer and the extreme increase in Asian price competition." Lloyds Bank argues persuasively that the loss of Ford orders had an effect that reached beyond the dollar value of lost sales, and impaired the ability to maintain efficiencies. Counsel quotes CNB's chief financial officer, who observed that the loss of Ford's business "was the single biggest event leading to the bankruptcy." Having made these arguments in defense of its appraiser's projections, Lloyds Bank must face the corresponding consequences. The success of CNB's business projections depended excessively on a single customer. Levels of foreseeability may

speak to the degree of risk, but some serious risk arises whenever a business lacks customer diversity.  Here, such specific company risk is merely confirmed by the fact that the loss of that single customer would impact so profoundly upon the debtor's sale projections.

Third, CNB faced a high risk of foreign competition.  Contrary to the assertions of the defendant, however, the preponderance of evidence established that this risk was not unforeseeable, even as of the date of closing.  Because labor represented a large component of the company's expense, the low costs of labor in Asia presented a clear danger of intense competition.  Although ownership of design archives might shield the aftermarket portion of the business, the company enjoyed no such protection of profitability in its manufacture of new presses.

Fourth , CNB encountered the risk of a failure of its business plan to concentrate all new press production in one facility and all aftermarket production at another location.  Lawrence Novak, a former vice-president of Clearing-Niagara, testified in designated deposition testimony that the business plan was untested in the industry.  Jeffrey Knoop, an underwriter for AT&T Commercial Finance Corporation, confirmed that this business plan had no historical precedent. Essentially, CNB accepted the danger of a loss of whatever synergistic benefits might accrue from close proximity of new press and aftermarket activity.

Fifth, the loyalties of management were divided, so that the company lacked a unity of commitment to financial success.  Timothy Kelleher served both as president of CNB and as chairman of Verson plc, an entity in which he held a 27 percent ownership interest.  Ultimately, he designed the formation transaction to fulfill the needs of Verson.  Moreover, Kelleher was an absentee officer, without residence in either of the principle places where CNB conducted business.  Such circumstances imposed limitations on the responsiveness of management and created additional specific risk.

For all of these reasons, the court must accept the argument of plaintiffs that the discount rate should incorporate a substantial unsystematic risk premium. Apart from its status as a small company, CNB encountered risks that were special and specific for its particular business activity. Hence, the plaintiffs' expert has suggested an additional risk premium of 5 percent. This, however, would represent more than one-third of the entire discount rate that the defendant's expert has proposed. Based on the evidence presented, the court believes instead that the unsystematic risk factor should fall within a range of 3 to 4 percent.

The parties disagree also about the method for establishing a terminal value in the discounted cash flow approach. For this calculation, Atkinson would use the Gordon Growth Model, while Schmitt proposes an EBITDA[2] exit multiple. Although the Gordon Growth Model may represent the more frequently used approach, both methods are consistent with sound appraisal practice. Accordingly, in evaluating the two reports, the court will not replace the professional judgment of either appraiser with regard to methods for calculating terminal values. Rather, we will focus on the one area of clear appraisal error, namely the application of an appropriate discount rate.

In his appraisal, Richard E. Schmitt calculates a discount rate of 14.67 percent. For the reasons stated above, the court believes that this rate should increase to include an un-systematic risk factor. Because Schmitt applies more aggressive projections, we find that that risk factor should fall at 4 percent, that being the upper range of appropriate premium. In assessing the Schmitt projections, therefore, the court sets the total discount rate at 18.67 percent. Without changing any other aspect of the Schmitt approach, the use of this discount rate will produce a business enterprise calculation of $60,852,000.

---

[2]EBITDA is an acronym standing for earnings before interest, taxes, depreciation and amortization.

Meanwhile, in his appraisal, Michael Atkinson used a discount rate of 18.7 percent, which included a specific company risk premium of 5 percent. Because Atkinson relied upon more conservative projections, however, the court believes that his unsystematic risk factor should have fallen into the lower range of appropriate premium, or 3 percent. Thus, in assessing the Atkinson projections, 16.7 percent would represent an appropriate discount rate. Again, without changing any other aspect of the Atkinson approach, the use of this discount rate will produce a business enterprise calculation within a low range of $52,537,000 and a high of $58,276,000.

Guideline Public Company Methodology: Under the guideline public company approach, an appraiser will compare the debtor and similar publicly traded companies with respect to financial information such as revenue, gross profit, EBITDA, and EBIT (earnings before interest and taxes). For each such factor, the appraiser establishes the ratio that arises from a comparison of the subject's projected financial data with actual data for the publicly traded comparable company. Giving appropriate weight to these ratios, the analysis then determines the value of the subject entity as having a similar composite ratio to the comparable company's market value.

Both appraisers used the guideline public company approach to calculate the business enterprise value of CNB. Applying this methodology, Atkinson found a business enterprise value in a range between $46.7 million and $53.7 million. On the other hand, Schmitt calculated the same value at $73.3 million. The court finds no clear reason to dispute either appraiser's selection of comparable companies. Rather, most of the difference in outcome derives from the decision by Schmitt to apply an investment control premium.

Without an investment control premium, Schmitt's guideline public company analysis would have yielded a business enterprise value of $58,175,400. He contends, however, that the comparable stock transfers involved the sale of minority interests, and that a premium must attach to the present acquisition of total ownership. Atkinson responds that a control premium

is inappropriate, because management had already incorporated those savings into its projections.

Schmitt correctly recognized that in those instances where a control premium is appropriate, it operates only as a limitation on the equity portion of value. In his analysis, Schmitt selected a control premium of 40 percent, and then assumed its application to an industry with a debt to equity ratio of 35 percent to 65 percent. Multiplying the 40 percent equity control premium by a 65 percent equity interest, he calculated an overall control premium of 26 percent. The problem with this analysis lies in his total failure to support the assumption of a 65 percent equity position.

In calculating value under the guideline public company methodology, a control premium has no relevance to property acquired through a fully leveraged buyout. Fundamentally, control premiums speak to an enhancement of equity value, by reason of an ability to control the management of a company. If shareholders lack a meaningful equity interest, however, their management works predominantly for the benefit of creditors. Hence, no control premium will attach to ownership.

In the present instance, any control premium must apply to the equity interest of stockholders in CNB. Ostensibly, Kelleher and Company LLC acquired an 85 percent ownership interest in CNB for a purported consideration of $4,250,000. This payment derived from a loan of money from Lloyd's Bank. Kelleher and Company LLC then secured that loan with a pledge of its stock in CNB. Representing no real equity investment, the stock position of Kelleher and Company LLC should not be treated as a investment against which an equity control premium can attach. Rather, the only true equity investments in the formation transaction came from senior managers through their purchase of stock for a consideration of $750,000. Any equity control premium is properly applied only to that small amount of equity, and will have no appreciable impact upon the total business enterprise value of the company.

In the formation transaction, CNB incurred approximately $5 million of closing costs. This sum matched the entire investment of equity in the common stock of CNB. For this reason also, CNB retained no equity to which a control premium might give additional value. Under these circumstances, we must reject the value enhancement that Schmitt would assign by reason of a control premium. Consequently, the court will give weight to Schmitt's guideline public company analysis, but only for a value of $58,175,400, that is, the indicated value without a control premium.

### Business Enterprise Value Compilation

In most instances, greater reliability will attach to a discounted cash flow method of valuation, as opposed to any type of comparable companies analysis. *Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (Bankr. S.D.N.Y. 2003). *See Questrom v. Federated Dept. Stores, Inc.,* 84 F. Supp.2d 483, 488 (S.D.N.Y. 2000), *aff'd,* 2 F.App'x 81 (2d Cir. 2001). In making comparisons to other companies, an appraiser must always assume similarity among comparable but unique entities. The lack of total identity will necessarily leave an element of uncertainty about the accuracy of the guideline public company approach. For this reason, the court will rely primarily on the discounted cash flow method, and will use the guideline public company method to confirm the result.

After adjusting the discount rate for the reasons stated herein, the discounted cash flow analysis in the Schmitt appraisal would have indicated a business enterprise value of $60,852,000. Meanwhile, again after adjusting the discount rate, Atkinson's discounted cash flow analysis would show a business enterprise value between $52,537,000 and $58,276,000. Having carefully considered all of the testimony and documentary evidence, the court finds that within the Atkinson appraisal, greater credibility should attach to the higher range of his projections. Hence, the discounted cash flow analyses would justify a value between

$58,276,000 and $60,852,000. An averaging of these two numbers would indicate a business enterprise value of $59,564,000.

Although the court assigns greater reliance to the discounted cash flow analysis, it will still look to the guideline public company approach as a useful indication of value. Without adjustment for any control premium, the guideline public company approach in the Schmitt appraisal would have indicated a business enterprise value of $58,175,400. Meanwhile, Atkinson found that his guideline public company analysis showed a business enterprise value between $46.7 million and $53.7 million. Again, within the Atkinson appraisal, greater credibility attaches to his higher range of value. Overall, the guideline company approach shows values that are reasonably close to those indicated by the discounted cash flow methodology. Surely, they confirm that the DCF method does not produce an overstatement of value. Taking into account all of the evidence with respect to both appraisal methods, the court will find a business enterprise value of $59.5 million.

To calculate the fair market value of CNB, both appraisers added current and other liabilities of $38,462,000 to the business enterprise value. Having determined a business enterprise value of $59,500,000, the court finds a fair market value of $97,962,000.

The two appraisers calculate a slightly different purchase price, namely $109,226,000 in the Atkinson report as compared to $113,175,000 in Schmitt's report. This difference does not represent a disagreement about facts, but instead reflects the different treatment of an escrow, a certain royalty obligation, and a capitalized lease. Surprisingly, each appraiser suggests a price calculation that is contrary to the outcome more favorable to his client. Essentially, the complaint alleges that CNB overpaid for property received in the formation transaction. Thus, Atkinson's lower price would indicate a lesser overpayment and a smaller level of damages. Schmitt's higher price would serve to exaggerate the lack of fair consideration. For purposes of the present analysis, however, we shall utilize the lower price.

As to this statement of consideration, the plaintiffs cannot complain, because it is the figure that they have proposed.  More importantly, the defendant's appraisal correctly observes that by removing the noted items from the purchase price, Atkinson made corresponding adjustments to his projections.  Accordingly, in assuming the lower purchase price, the court has similarly accorded an appropriately adjusted weight to any resulting differences in projections.

Based on the foregoing analysis, we conclude that CNB received consideration having a value of $97,962,000, and that this sum is at least $11,264,000 less than the purchase price of $109,226,000.  Altogether, therefore, CNB received a lack of fair consideration in exchange for the total purchase price that it advanced in connection with the formation transaction.  However, that transaction included three components, namely the purchase of assets from E.W. Bliss Company, from Enprotech, and from Clearing-Niagara.  Because Lloyds Bank received payment through the Clearing-Niagara component only, we must consider whether fair consideration was received with respect to that portion of the sale.

CNB purchased the assets of E.W. Bliss Company for an adjusted consideration of $15,395,315, together with the assumption of liabilities of approximately $5,300,000.  All of the evidence indicates that the price was set through arms-length negotiation.  Although limited in scope, the proof suffices to show the adequacy of consideration for this component of the transaction.

CNB paid Enprotech an adjusted consideration of $5,984,000, together with an assumption of liabilities in the approximate amount of $500,000.  In exchange for this consideration, CNB received the half interest of Enprotech in an entity called Press Parts Plus, which owned various design archives.  Prior to the transaction, Clearing-Niagara held the other half interest in Press Parts Plus.  Through evidence presented at trial, Lloyds Bank established that these design archives had a full fair market value of $28,000,000.  Although the plaintiffs' expert opined that the archives had a somewhat lesser value, we find the valuation by the

Bank's expert to be credible, and will hold the defendant to the consequences of its position. Essentially, CNB paid approximately $6.5 million dollars for assets having a value of $14 million. For a half interest in the archives, therefore, CNB paid to Enprotech a consideration far less than the value of what it acquired.

Inasmuch as CNB received fair consideration in its acquisition of assets from E.W. Bliss Company and from Enprotech, the entire deficiency of consideration must necessarily derive from the acquisition of assets from Clearing-Niagara. Indeed, synergistic benefits may have ameliorated what would otherwise have been an even more substantial shortfall of fair consideration. Accordingly, the court will attribute the entire shortfall of fair consideration to the Clearing-Niagara component of the formation transaction. We conclude, therefore, that CNB did not receive fair consideration for its transfer of payment to Clearing-Niagara.

**Issue 2. Was CNB insolvent either at the time that it paid $43,805,838 to Clearing-Niagara or as a consequence of that payment?**

In assessing the solvency of CNB, both appraisers begin their analysis with reference to the balance sheet that the company's auditors prepared as of the closing of the formation transaction. Schmidt and Atkinson then make adjustments to that balance sheet, most particularly with respect to the valuation of fixed assets. Both appraisers agree that the debtor had liabilities of $104,988,000 as of the closing. On behalf of the plaintiffs, Atkinson concludes that the debtor was insolvent, in that its assets had a fair market value between $70,812,000 and $97,392,000. In contrast, Schmitt asserted the defendant's solvency based upon asset values of $114,464,000.

The value of intangible assets accounts for most of the difference between the adjusted balance sheets of the two appraisals. In assessing these intangible assets, Schmitt and Atkinson incorporate valuations performed by third parties. However, we need not give specific attention to this component of value. Nor should the court allow itself to be drawn into an

isolated controversy. Rather, it suffices to rely upon the business enterprise value that the court has already set for purposes of its finding of a lack of fair consideration.

Business enterprise value equals net working capital plus the value of property, plant and equipment, plus the value of intangible and other assets. Earlier in this opinion, the court found that as of the date of closing of the formation transaction, CNB had a business enterprise value of $59.5 million. Like both expert appraisers, the court begins its insolvency calculation with the audited balance sheet for October 18, 1996. This balance sheet indicates a business enterprise value of $74,711,000. To determine the status of solvency, we must replace the indicated business enterprise value with the calculated value of $59,500,000. Making this adjustment, the court finds that as of the date of closing, CNB had assets of $97,964,000 and liabilities of $104,988,000. From a balance sheet perspective, the company's liabilities exceeded its assets by $7,024,000. We conclude, therefore, that CNB was rendered insolvent by reason of the formation transaction.

**Issue 3: After its payment of $43,805,838 to Clearing-Niagara, was CNB left with an unreasonably small working capital for the business in which it was about to engage?**

As an alternative basis for relief, plaintiffs allege that CNB transferred assets to Clearing-Niagara at a time when CNB was about to engage in a business with unreasonably small capital. In their arguments, both plaintiffs and defendant assert projections regarding the debtor's ability to satisfy anticipated obligations and to sustain future obligations. Unquestionably, reasonable capitalization includes access to cash sufficient to satisfy the reasonably foreseeable needs of a business. *See Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1073 (3rd Cir. 1992), *Ring v. Bergman (In Re Bergman)*, 293 B.R. 580 (Bankr. W.D.N.Y. 2003). If reasonable foreseeability were the only determinant of adequate capitalization, then this issue would necessarily require an assessment of competing projections. But adequate capitalization looks not only to the future, but to the present as well. *See O'Day*

*Corp. v. Meritor Savings Bank (In re O'Day Corp.)*, 126 B.R. 370, 407 (Bankr. D. Mass. 1991). In the instant matter, CNB began operations substantially without sufficient capital to meet immediate needs on its first day of business.

In developing his proposal for the formation of CNB, Timothy Kelleher arranged for the accounting firm of Ernst & Young LLP to prepare a summary of the transaction strategy. The business plan contemplated a revolving credit facility of $19.4 million, against which the debtor would borrow $16 million at closing. Thus, the plan contemplated a remaining credit availability of $3.4 million, which CNB could then access to satisfy both assumed and anticipated payables. Between the preparation of the business plan and the closing, however, the facts changed. The cost of the transaction increased, so that the debtor drew down against more of the revolving credit facility. As a consequence, immediately after closing, the debtor had available credit of only $716,000. Meanwhile, outstanding accounts payable had increased.

The weekly payroll of CNB totaled approximately $500,000. Thus, at the moment of its formation, CNB needed to reserve essentially all of its remaining credit facility for payroll expenses. As of the closing, the debtor had outstanding trade payables that totaled the astounding sum of $15,456,000. Most troubling was the fact that CNB was deferring payment of obligations by more than 120 days. Even Richard E. Schmitt, the defendant's own expert, acknowledged that the debtor's payable schedule had "extended beyond industry norms." Upon its formation, therefore, CNB lacked working capital sufficient to enable it to satisfy its assumed payables, either immediately or within the standard for the machine tool industry. For this reason alone, the court finds that at the closing of the formation transaction, the debtor undertook to engage in a business at a time when it possessed an unreasonably small capital within the meaning of section 274 of the New York Debtor and Creditor Law.

The court realizes that in order to extend resources, many businesses will "stretch" their payables. Indeed, a company's chief financial officer is charged with the duty to manage cash

flow.  In many instances, a CFO will establish policies designed to delay payment of payables and to accelerate collection of receivables.  The commonness of this practice, however, provides no excuse for the failure to pay trade obligations as they become due.    Moreover, in the present instance, this practice constituted not just a discretionary policy, but a process of necessity.  From its very formation, CNB lacked sufficient capital to pay its trade creditors as contractually agreed on a timely basis.  Admittedly, the company managed to avoid bankruptcy for 29 months after closing the formation transaction.  The ability to "get away" with delay of payment, however, cannot change the fact that the debtor operated at all times without sufficient capital to pay its debts as they became due.

Capitalization is adequate only when it suffices to fulfill the reasonable and justified expectations of creditors.  Equity interests assume the risk of loss and the possibility of a delayed recovery of investment.  Holders of long term debt may agree to extended terms, often with the risk that unforeseen circumstances may compromise the borrower's ability to pay.  But trade creditors assume none of these risks.   For this reason, a debtor lacks adequate capitalization whenever it cannot reasonably anticipate resources needed to effect the timely payment of its trade obligations.

To support the defendant's assertion of adequate capitalization, Richard Schmitt presented his report containing a schedule of cash flow projections.  He errs, however, in his standard of adequacy.  As noted on page 67 of his report, Schmitt argues that the projections show an ability to pay principal and interest on long term debt.  This evidence fails to suffice, because the projections offer no assurance of timely payment of trade obligations.  To the contrary, Schmitt projects outstanding accounts payable of $11,481,000 after twelve months of operation.  Then in his testimony, Schmitt acknowledges that these projected payables would continue to reflect an aging that exceeds the industry norm.

We need not compare Schmitt's report with the more conservative projections of the plaintiffs' expert. Fanciful projections of future cash sufficiency will not excuse the lack of capital, on the day of closing, to pay all overdue obligations. The debtor simply has no right to demand that trade creditors provide interest-free financing as a substitute for necessary capital requirements. Hence, we must conclude that the debtor's payment to Clearing-Niagara occurred at a time when it was about to engage in a business where its remaining assets constituted an unreasonably small capital.

### Issue 4. Was Lloyds Bank an initial transferee of funds from CNB?

Section 550(a) of the Bankruptcy Code allows a trustee to recover avoided transfers from either "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." With respect only to the second category consisting of immediate or mediate transferees of the initial transferee, section 550(b) imposes various defenses against recovery of an avoided transfer. With this consideration in mind, the plaintiffs urge that Lloyds Bank should be treated as the initial transferee or the entity for whose benefit the transfer was made.

The structure of the disputed transaction involved an initial deposit of funds into an account that Clearing-Niagara maintained at Marine Midland Bank. Pursuant to instructions given prior to that deposit, the sum of $25,985,569 was then transferred to Lloyds Bank. The plaintiffs contend that Clearing-Niagara operated as a mere conduit, so that Lloyds Bank would essentially qualify as the initial transferee of payment from CNB.

In asserting their conduit theory, the plaintiffs cite various decisions which disregarded the form of the transaction in order to recognize the final recipient of funds as an initial

transferee.  *See, e.g., Andreini & Co. v. Pony Express Delivery Services, Inc. (In re Pony Express Delivery Service, Inc.)*, 440 F.3d 1296 (11th Cir. 2006), *Christy v. Alexander & Alexander of New York, Inc. (In re Finley Kumble, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52 (2nd Cir. 1997), *In re Bullion Reserve of North America*, 922 F.2d 544 (9th Cir. 1991).  As in the instant matter, assets were transferred temporarily into the name of an initial recipient, who then transferred those assets into the defendant's name.  In all of the above cited cases, however, the final recipient also exercised control and domination over the nominal first recipient.  In the present instance, however, the preponderance of evidence fails to show the necessary level of domination and control.  Rather, the management of Verson plc and Clearing-Niagara understood the need for restructuring, and responded without prompting from the defendant.  It will not suffice for an intermediary to set itself up as a conduit.  That conduit structure must arise at the behest or direction of the ultimate recipient of funds.  Although Lloyds Bank provided essential funding and even though it may have participated in the formation transaction without good faith, that participation did not rise to the level of domination and control.  Accordingly, in the present instance, the initial transferee of consideration from CNB was Clearing-Niagara, and not Lloyds Bank.

Lloyds Bank also does not qualify as an entity for whose benefit the challenged transfer was made.  For purposes of section 550, a transferee cannot qualify as the beneficiary of the transfer.  "The structure of the statute separates initial transferees and beneficiaries, on the one hand, from 'immediate or mediate transferee[s]', on the other.  The implication is that the 'entity for whose benefit' is different from a transferee, 'immediate' or otherwise.  The paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor - someone who receives the benefit but not the money."  *Bonded Financial Services v. European Amer. Bank*, 838 F.2d 890, 895 (7th Cir. 1988).  *Accord, Enron Corp. v. J.P. Morgan Securities (In re Enron Corp.*, 361 B.R. 36, 49 (Bankr. S.D.N.Y. 2006).

As a subsequent recipient of the transfer, Lloyds Bank will not fall into the first category of defendants having liability under 11 U.S.C. §550(a)(1).  Rather, any exposure will derive from 11 U.S.C. §550(a)(2), which extends limited liability to "any immediate or mediate transferee" of the initial transferee.

### Issue 5:  Did Lloyds Bank take for value, in good faith, and without knowledge of the voidability of the transfer?

Section 550(b) of the Bankruptcy Code establishes a defense available only to the immediate or mediate transferee of an initial transferee.  Specifically, this subdivision provides as follows:

> The trustee may not recover under [11 U.S.C. §550(a)(2)] from (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or (2) any immediate or mediate good faith transferee of such transferee.

In the present instance, therefore, a defense under section 550(b) will arise only if the preponderance of  evidence can establish each of three facts: first, that Lloyds Bank took the transferred assets in exchange for something of value; second, that Lloyds Bank acted in good faith; and third, that Lloyds Bank acted without knowledge of the voidability of the transfer.

Cases have reached divergent results on the issue of whether the plaintiff carries the burden of proof to show the absence of a defense under section 550(b), or whether this burden falls to the defendant to demonstrate the three requirements of the statute.  *Compare Hooker Atlanta Corp. v. Hooker (In re Hooker Investments, Inc.)*, 155 B.R. 332, 337 (Bankr. S.D.N.Y. 1993) and *Genova v. Gottlieb (In re Orange County Sanitation, Inc.)*, 221 B.R. 323 (Bankr. S.D.N.Y. 1997) with *Lustig v. Hickey (In re Hickey)*, 168 B.R. 840, 850 (Bankr. W.D.N.Y. 1994). We need not decide this issue, however, because the preponderance of evidence indicates the same outcome without regard to burden of proof.  Here, the defendant exchanged value, in that it discharged the indebtedness of Verson plc in the amount of $24,385,569, and issued a letter

of credit to Clearing-Niagara in the amount of $1,600,000. The defense fails, however, because the defendant acted without good faith, but with knowledge of the transfer's voidability.

Black's Law Dictionary defines good faith as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." BLACK'S LAW DICTIONARY 701 (7th ed. 1999). In the present instance, Lloyds Bank failed the test of good faith, in that it violated reasonable standards of fair dealing and with the intent to seek unconscionable advantage over general unsecured creditors of CNB.

Counsel for Lloyds Bank attempted to paint their client as an innocent recipient of moneys due and owing. In truth, Lloyds Bank participated actively in the formation of CNB. Timothy Kelleher communicated regularly with Lloyds Bank, and kept Lloyds Bank informed about all aspects of his developing proposals. Meanwhile, bank officers prepared memoranda which carefully analyzed Kelleher's plans, and which even suggested alternatives. Counsel for Lloyds Bank attended the closing in October of 1996. Most critically, Lloyds Bank provided the funding that enabled Kelleher and Co. LLC to make the equity investment needed to complete the formation transaction.

Lloyds Bank funded Kelleher and Company LLC in the amount of $10,000,000 and thereby enabled the closing of a transaction that resulted in payment of obligations that Verson plc owed to Lloyds Bank in the amount of $24,385,569. From the perspective of Lloyds Bank, therefore, the formation transaction had the effect of reducing the bank's exposure and risk of loss by $14,385,569. This reduction was important to Lloyds Bank because the obligations of Verson plc had become highly under-collateralized. Thus, in a memorandum dated July 18, 1996, a senior corporate manager at Lloyds Bank wrote cryptically about the formation transaction as follows: "We finally have arrived at the point with this relationship where we

thought we would achieve a much needed reduction in our exposure, enhance our security but to do so must lend to Kelleher and Co."

In achieving a positive outcome for Lloyds Bank, the formation transaction created a new entity without sufficient working capital to address unsecured obligations as they became due. At the time of closing, Lloyds Bank had access to all of the essential data regarding CNB. It would have realized that the transaction was highly leveraged and had made no arrangement for the timely payment of approximately $15 million dollars of unsecured debt, most of which was long past due. Fundamentally, Lloyds Bank had financed the closing of a transaction whose purpose and effect was to transfer risk from Lloyds Bank to a collection of unsecured creditors who were not represented at the closing.

In a competitive marketplace, every creditor may appropriately seek to maximize its own recovery. Inevitably, when a debtor lacks resources to pay everyone in full, collection by one creditor will impair the likelihood of payment to others. To the aggressive creditor goes the reward of recovery from its obligor. In the present instance, the difference is that Lloyds Bank enabled a recovery not from any outstanding obligor, but from CNB and to the detriment of existing and future creditors of that newly created entity. Knowing that CNB would be leveraged so highly as to create a business with insufficient working capital, Lloyds Bank nonetheless financed the formation transaction. Such conduct belies any reasonable standard of fair dealing and gave to Lloyds Bank an unconscionable advantage over other creditors. For these reasons, we must find that in taking value that derived from CNB, Lloyds Bank failed to act in good faith.

Aside from any issue of good faith, a defense under 11 U.S.C. §550(b) will arise only if the transferee takes "without knowledge of the voidability of the transfer avoided." As noted by Judge Easterbrook, "[n]o one supposes that 'knowledge of voidability' means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do." *Bonded Financial Services v. European Amer. Bank*, 838 F.2d

890, 898 (7th Cir. 1988).  For a determination of liability, it will suffice if an immediate or mediate transferee has "knowledge of a potential basis for the avoidance."  *Wallach v. Altmeyer (In re Altmeyer)*, 268 B.R. 349, 357 (Bankr. W.D.N.Y. 2001).  The applicable standard looks not for any certainty of avoidance, but for an awareness of that real possibility.  "[T]he transferee must have knowledge of sufficient facts that (i) puts the transferee on notice that the transfer might be avoidable or (ii) requires further inquiry into the situation and such inquiry is likely to lead to the conclusion that the transfer might be avoided."  *Mosier v. Goodwin (In re Goodwin)*, 115 B.R. 674, 677 (Bankr. C.D.Cal. 1990) (emphasis added).

In the present instance, Lloyds Bank accepted the transfer of funds with knowledge of the distinct possibility that that transfer might be subject to avoidance.  To be specific, Lloyds Bank knew facts suggesting the three required elements of proof in an action to avoid a fraudulent conveyance, namely that CNB received less than fair consideration from its purchase of assets from Clearing-Niagara; that CNB was insolvent at the time of transfer; and that the transaction left CNB with an inadequate amount of working capital.

Lloyds Bank realized that the formation transaction might likely represent a transfer for less than fair consideration.  In a memo to the Corporate Banking Director of Lloyds Bank on July 30, 1996, the senior corporate manager of the Verson account wrote that he recommended the formation transaction, because it would unlock "a value in Clearing-Niagara of $46M which I am certain that by itself, to a trade buyer, would not achieve probably more than $28M."

Because it had clearly paid more than fair market value for the stand-alone assets of Clearing-Niagara, CNB could only net a fair consideration if the entire transaction was able to achieve some synergistic advantages.  As evidence of these advantages, Timothy Kelleher presented a confidential memorandum prepared by the accounting firm of Ernst & Young LLP. The opening line of that memorandum stated that it was "based upon information supplied by the management of Clearing-Niagara, Inc."  Lloyds Bank knew, however, that the foundational

information was either inaccurate or unreliable.  On July 18, 1996, in a different memorandum to the Corporate Banking Director of Lloyds Bank, the senior corporate account manager observed that another of Verson's projections had proven to be inaccurate.  He concluded that for CNB as a consolidated entity, "[a]t best true business values are circa $40 M."

As evidenced by written memoranda, Lloyds Bank had estimated a value of only $28 million dollars for the same assets for which CNB paid $43,805,838 to Clearing-Niagara.  Meanwhile, Lloyds Bank estimated a value of $40 million for the consolidated assets that CNB would purchase from Clearing-Niagara, E.W. Bliss Company, and Enprotech for a total combined price of $65,185,153, together with an assumption of liabilities.  At a minimum, Lloyds Bank had reason to believe that CNB would receive less than fair consideration for its payment to Clearing-Niagara.

When carried over to CNB's balance sheet, the estimates of value by Lloyds Bank would indicate insolvency.   For the reasons stated above, Lloyds Bank also knew that the transaction would leave CNB with insufficient working capital to pay its unsecured creditors on a timely basis.   Hence, the bank either knew or should have known that CNB's transfer to Clearing-Niagara was probably avoidable under both section 273 and section 274 of the New York Debtor and Creditor Law.

### Conclusion regarding Liability

For the reasons stated herein, the court finds that CNB did not receive fair consideration for its transfer of payment to Clearing-Niagara.   As a consequence of this transfer, CNB was rendered insolvent on a balance sheet basis.   Thus, CNB's payment of $43,805,838 was fraudulent under Debtor and Creditor Law §273.  Further, the payment to Clearing-Niagara left CNB with an unreasonably small capital for the business in which it was about to engage.  Thus, the payment to Clearing-Niagara was also fraudulent under Debtor and Creditor Law §274. Having orchestrated the formation transaction, Clearing-Niagara had knowledge of the fraud at

the time of its receipt of payment from CNB.  Consequently, pursuant to Debtor and Creditor

Law §278, a matured creditor of CNB could have set aside the transfer of assets from CNB to

Clearing-Niagara.

Section 544(b) of the Bankruptcy Code empowers a trustee to avoid any transfer that

a creditor may avoid by reason of the New York Debtor and Creditor Law.  Because an

unsecured creditor of CNB could have set aside the transfer of assets from CNB to

Clearing-Niagara, the trustee of CNB may obtain the same relief.  Having set aside CNB's

transfer to Clearing-Niagara, the trustee may recover the value of that transfer pursuant to the

provisions of 11 U.S.C. §550(a).  This later section allows recovery of damages either from

Clearing-Niagara as the initial transferee, or from Lloyds Bank as the immediate transferee of

the initial transferee.  Because it took value in bad faith and with knowledge of the voidability

of the transfer, Lloyds Bank will not benefit from the defense created under 11 U.S.C. §550(b).

Accordingly, Lloyds Bank is liable to the plaintiffs for the value of any property that it received

from the transaction.

## Damages

In a fraudulent conveyance proceeding under the New York Debtor and Creditor Law,

damages are generally calculated as the difference between the value of assets transferred and

the value of any consideration received.  *See Brown v. Kimmel*, 68 A.D.2d 896 (2nd Dept.

1979) and *Langan v. First Trust & Deposit Co.*, 277 A.D. 1090 (4th Dept. 1950).  Similarly, 11

U.S.C. §550(a) allows a trustee to recover the value of any fraudulently transferred property

"to the extent that a transfer is avoided."  When a defendant has paid some but less than full

consideration, that value is set as the amount of the inadequacy.  *See, e.g., Hirsch v. Steinberg

(In re Colonial Realty Co.)*, 226 B.R. 513 (Bankr. D. Conn. 1998), *Kuhn v. Nance (In re Nance),*

26 B.R. 105 (S.D. Ohio 1982).  In the present instance, CNB paid a consideration that was

$11,264,000 greater than the value of assets that it acquired through the formation transaction.

That inadequacy of consideration will constitute damages that plaintiffs may recover as a fraudulent conveyance from a proper party defendant.

Lloyds Bank contends that liability should be assigned pro rata among all of the ultimate recipients of consideration from CNB. As calculated by Lloyds Bank, CNB disbursed a total of $113,175,000. From the portion paid to Clearing-Niagara, Lloyds Bank received $25,985,569, or approximately 22.96 percent of the total price. Accordingly, the bank urges that its liability be limited to this percentage of any shortfall of consideration. This argument, however, presents an overly simplistic view of the transaction, for it fails to distinguish the culpability of each initial transferee and further fails to consider the rationale for liability of any subsequent transferee.

In a complex transaction with multiple disbursements, the allocation of fraudulent conveyance liability really involves two issues. First, how is liability to be assigned among initial transferees of funds from the debtor. Second, after one determines the liability of each initial recipient, to what extent may that liability be recovered from an immediate or mediate transferee from the initial transferee. In the present instance, the liability of Lloyds Bank derives from the payment to Clearing-Niagara. Thus, in allocating liability, we must first determine what should have been the exposure of Clearing-Niagara as an initial transferee, after which we can consider the exposure of each subsequent transferee from Clearing-Niagara.

**Allocation among initial transferees:** Leveraged buyouts will frequently present complex issues regarding the allocation of liability under the fraudulent conveyance statute. *See* Robert J. White, *Leveraged Buyouts and Fraudulent Conveyance Laws under the Bankruptcy Code - Like Oil and Water, They Just Don't Mix*, 1991 ANN. SURV. AM. L. 357 (1992). Fortunately, the present circumstances avoid this problem, because so much of the inadequacy of consideration is attributable to Clearing-Niagara.

In the form of either cash or the assumption of liability, CNB gave consideration to E.W. Bliss Company, to Enprotech Mechanical Services, Inc., to Clearing-Niagara, and to 10 claimants for reimbursement of closing costs. In our earlier discussion regarding the fairness of consideration, we concluded that CNB had paid a fair consideration for the assets of E.W. Bliss Company, and that CNB had actually acquired the archive interests of Enprotech for a bargain price approximately $7.5 million less than value. Even with these fair or favorable components, the entire formation transaction caused CNB to suffer damages in the amount of $11,264,000. Because the evidence provides no basis to assign liability to either E.W. Bliss Company or Enprotech portions of the transaction, we must allocate damages either to Clearing-Niagara or to the entities that have received payment for closing costs.

In the formation transaction, CNB disbursed $4,851,893 among the ten claimants for closing costs. Most notoriously, these included Timothy Kelleher, who received a commission of $1,000,000. Different circumstances might have required some allocation of liability among these closing cost recipients. Here, however, the shortfall of fair consideration was ameliorated by the bargain derived from the transaction with Enprotech, to a degree greater than the entire disbursement for closing costs. But for the bargain received from Enprotech, the damages would have amounted to more that $18 million. Even if all closing costs were fully disgorged, Clearing-Niagara could still be charged with receipt of excess consideration in the amount of more than $13 million. Accordingly, Lloyds Bank has no basis to complain if damages of only $11,264,000 were to be imposed upon Clearing-Niagara or upon its transferees.

**Allocation among subsequent transferees**: To the extent that an initial transferee would have liability for a fraudulent transfer, a trustee may recover that transfer from a subsequent transferee of those funds, without the necessity for allocation among all subsequent transferees. Although 11 U.S.C. §550(d) allows the trustee to recover "only a single satisfaction," the statute expressly allows recovery from "*any* immediate or mediate transferee of such initial transferee." 11 U.S.C. §550(a)(2)(emphasis added). Accordingly, to the extent

that Clearing-Niagara would have liability for the fraudulent portion of the transfer from CNB, the plaintiffs may recover that entire liability from Lloyds Bank, for up to the amount that Lloyds Bank received from Clearing-Niagara.

In the formation transaction, CNB paid cash consideration of $43,805,838 to Clearing-Niagara, which then paid $24,385,569 to Lloyds Bank on account of antecedent debt. Because the liability of Clearing-Niagara would have been for a sum less than the amount disbursed to Lloyds Bank, Lloyds Bank can be held responsible for the entire liability for fraudulent conveyance, without the necessity of allocation among other transferees.

**Offsets**: Although responsibility falls to Lloyds Bank for the entire amount of damages arising from the fraudulent conveyance, that liability will be offset by any recovery from other transferees. Section 550(d) of the Bankruptcy Code states the applicable rule, that a trustee "is entitled to only a single satisfaction" on a claim for damages resulting from a fraudulent conveyance. The present adversary proceeding initially sought recovery from fifteen named defendants. Thereafter, upon motion with notice to all defendants, this court approved three settlements which collectively resolved claims against a majority of the parties. Pursuant to these settlements, the plaintiffs have already collected $275,000 from the law firm of Schwartz & Freeman; $200,000 from Enprotech and related defendants; and $150,000 from Timothy S. Kelleher and related parties. Together, these settlements represent payment of $625,000, and must be set off against the total damages. Moreover, with regard to the Enprotech and Kelleher interests, the settlement orders expressly state that these payments will reduce the total satisfaction that the plaintiffs could otherwise recover from any remaining defendant.

By reason of the fraudulent character of the formation transaction, CNB suffered damages in the amount of $11,264,000. Against this amount, the court will apply offsets for settlements in the amount of $625,000. Accordingly, Lloyds Bank remains liable to the plaintiffs for $10,639,000.

**Interest**: With respect to the outstanding liability, plaintiffs contend that New York law allows them to recover interest from the filing of their complaint, at the legal rate of nine percent.  In response, Lloyds Bank asserts that the court has discretion to deny prejudgment interest, and that equitable considerations should limit interest to a rate no greater than three percent.  To resolve this issue, we need to understand the provisions of New York's Debtor and Creditor Law, and to examine how 11 U.S.C. §544 works selectively to apply those provisions in a bankruptcy context.

Article 10 of the Debtor and Creditor Law contains the statutory provisions for recovery of fraudulent conveyances under New York Law.  Sections 273 through 277 of the statute define when a transaction is fraudulent.  The basic forms of remedy are then specified in sections 278 and 279.  For creditors whose claims have matured, section 278 states two potential remedies with respect to conveyances or obligations that are fraudulent, namely either (a) to "have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim," or (b) to "[d]isregard the conveyance and attach or levy execution upon the property conveyed."  Section 279 then states the rights of creditors whose claims have not yet matured.  Again with respect to conveyances or obligations that are fraudulent, this latter section specifies four potential remedies.  Pursuant to section 279, "the court may, (a) Restrain the defendant from disposing of his property, (b) Appoint a receiver to take charge of the property, (c) Set aside the conveyance or annul the obligation, or (d) Make any order which the circumstances of the case may require."

Nowhere does the New York Debtor and Creditor Law authorize a money judgment against the recipient of a fraudulent conveyance.  As explained in New York Jurisprudence 2d, this remedy has instead been recognized through judicial decisions:

> As a general rule, the statutory provisions . . . do not authorize the granting of a money judgment against the fraudulent transferee.  Ordinarily, the relief to which a defrauded judgment creditor is entitled in an action to set aside a fraudulent conveyance is limited to setting aside the conveyance of the

> property which would have been available to satisfy the judgment had there been no conveyance. That is to say, property fraudulently transferred constitutes a trust fund to be pursued, and such pursuit normally may not be abandoned in favor of obtaining a judgment in personam against the transferee for the value of the property.
>
> On the other hand, the court in an action to set aside a fraudulent conveyance may exercise its equitable powers and award a personal money judgment against the transferee in lieu of setting the transfer aside where the facts of the case establish personal liability.

30 N.Y. Jur. 2d, *Creditors Rights and Remedies* §446 (2006). When a New York State court exercises jurisdiction to award a money judgment, interest on that judgment would then be awarded as required under Article 50 of the New York Civil Practice Law and Rules.[3]

A trustee does not acquire every right that a creditor might enjoy outside bankruptcy. Rather, 11 U.S.C. §544 carefully delineates additional trustee powers that derive through reference to state law. In the present instance, the authority to exercise rights under the New York Debtor and Creditor Law originates from 11 U.S.C. §544(b)(1), which states in relevant part that "the trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim . . . ."

New York law gives a panoply of rights to creditors who may have been victimized by a fraudulent conveyance. As described above, these rights include transfer avoidance, execution against transferred assets, and the opportunity to secure a money judgment. Among all of these rights, however, only the state right of transfer avoidance devolves to a bankruptcy trustee pursuant to 11 U.S.C. §544. This is not to say that a trustee is precluded from securing a money judgment. Rather, any such remedy must derive not from state law, but from an application of 11 U.S.C. §550. To reiterate, subdivision (a) of this later statute provides that "to the extent that a transfer is avoided under section 544 . . . the trustee may recover, for the

---

[3]For reasons stated hereafter, the interest provisions of C.P.L.R. Article 50 have no application to the present dispute. Accordingly, we need not now consider whether New York law would impose the legal interest rate of nine percent (C.P.L.R. §5004) or some lesser rate as might be allowed if the court were to deem this action to be of an equitable nature (C.P.L.R. §5001(a)).

benefit of the estate, the property transferred, or, *if the court so orders, the value of such property*, from - (1) the initial transferee of such transfer . . . or (2) any immediate or mediate transferee of such initial transferee." (emphasis added).

Because the right to a money judgment derives from section 550 of the Bankruptcy Code, the plaintiffs may not recover interest based per se on the New York legal rate of nine percent. If they are to receive any pre-judgment interest at all, plaintiffs must instead ground that additional remedy on the provisions of the Bankruptcy Code.

The Bankruptcy Code does not authorize the award of any particular rate of pre-judgment interest upon the recovery of a fraudulent conveyance. Nonetheless, at least one leading treatise has suggested that the "bankruptcy court should exercise its equitable powers to award the trustee interest and costs when appropriate." 5 COLLIER ON BANKRUPTCY ¶550.02[3][b](Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 15th ed. rev. 2002). Indeed, a number of courts have granted such relief. *See, e.g., In re Cardon Realty Corp.*, 146 B.R. 72 (Bankr. W.D.N.Y. 1992).

In bankruptcy, the right to recover prejudgment interest on a fraudulent conveyance arises from that language in 11 U.S.C. §550(a) which allows a trustee to recover "the value" of the transferred property. To obtain such value, the plaintiffs need some accommodation for the time value of money. Prejudgment interest fulfills this purpose. The New York Court of Appeals has aptly described this rationale in a slightly different context: "[A] just indemnity, though it may sometimes be more, can never be less, than the specified amount of money, or the value of the property or services at the time they should have been paid or rendered, with interest from the time of the default until the obligation is discharged." *Van Renssalaer v. Jewett*, 2 N.Y. 135 (1849).

In the present instance, an appropriate level of pre-judgment interest will accomplish an objective similar to that of 28 U.S.C. §1961, which allows for interest on federal judgments.

Accordingly, the court looks to this statute for guidance on the applicable rate of interest. Pursuant to section 1961, post judgment interest is based on the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System. In their post-trial brief, the plaintiffs have conceded that interest should be calculated from the filing of their complaint on March 8, 2001.[4] Because more than seven years have transpired from that date, the interest on that date will not necessarily reflect the real value of transferred assets over that entire period. Instead, the court will apply the average of the weekly 1 year constant maturity Treasury yields for the 392 weeks during which this matter has been litigated. This average comes to 2.975 percent. In the court's view, this rate fairly reflects the time value of money. As applied to a base liability of $10,639,000, interest from March 8, 2001 through the date of this opinion will total $2,372,526.14.

## Conclusion

When CNB was formed in 1996, its management predicted a promising future with synergies that would inure to the benefit of investors, creditors, employees, and the community of Western New York. In truth, the evidence shows that Timothy Kelleher had designed the formation transaction to resolve liabilities that a parent company owed to Lloyds Bank. While it may have had rights against a predecessor company called Clearing-Niagara, Lloyds Bank had no justification for any violation of the rights of creditors of the newly formed company. Essentially, the transaction effected a transfer of exposure from Lloyds Bank to unsuspecting trade creditors. To address such conduct, the State of New York and Congress have respectively enacted the relevant provisions of the Debtor and Creditor Law and the Bankruptcy Code. For the reasons stated herein, these statutes impose liability upon Lloyds Bank for the

---

[4] In their complaint, the plaintiffs ask for interest from the closing of the formation transaction on October 18, 1996. In view of the concession made by plaintiffs in their closing submission, the court will not now decide whether interest can ever be awarded for time prior to the date of demand, which was here made upon the filing of the complaint.

value of fraudulently transferred assets in the net amount of $10,639,000, together with interest in the amount $2,372,526.14.

By reason of the foregoing, this court will award judgment to the plaintiffs and against Lloyds Bank for the sum of $13,011,526.14, together with costs and interest from the date of judgment.

So ordered.

Dated:        Buffalo, New York               /s/      CARL L. BUCKI
              September 5, 2008                Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.